AO 91 (Rev. 11/11) Criminal Complaint                                           SAUSA Chester Choi (312) 469-6052

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

**FILED**

AUG 1 3 2019

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | CASE NUMBER: |
| GREGORIO CASTILLO, JR. | |

**19 CR 645**

**MAGISTRATE JUDGE COX**

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about August 12, 2019, at Elmwood Park, in the Northern District of Illinois, Eastern Division, the defendant violated:

| Code Section | Offense Description |
|---|---|
| Title 21, United States Code, Section 841(a)(1) | did knowingly and intentionally possess with intent to distribute 100 grams or more of a mixture and substance containing a detectable amount of heroin, a Schedule I Controlled Substance. |

This criminal complaint is based upon these facts:

  X   Continued on the attached sheet.

_____

ANTONIO VAZQUEZ
Task Force Officer, Drug Enforcement
Administration (DEA)

Sworn to before me and signed in my presence.

Date: August 13, 2019 _____

_____
*Judge's signature*

City and state: Chicago, Illinois _____

SUSAN E. COX, U.S. Magistrate Judge _____
*Printed name and Title*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

## AFFIDAVIT

I, Antonio Vazquez, being duly sworn, state as follows:

1.      I am a Task Force Officer with the Drug Enforcement Administration ("DEA") and have been so employed since approximately May 2016. I am currently assigned to the DEA Chicago Field Division, and my responsibilities include the investigation of narcotics trafficking offenses, including offenses defined by 21 U.S.C. §§ 841 and 846.

2.      This affidavit is submitted in support of a criminal complaint alleging that GREGORIO CASTILLO, JR. has violated Title 21, United States Code, Section 841(a)(1).   Because this affidavit is being submitted for the limited purpose of establishing probable cause in support of a criminal complaint charging CASTILLO, JR. with knowingly and intentionally possessing with intent to distribute 100 grams or more of a mixture and substance containing a detectable amount of heroin, a Schedule I Controlled Substance. I have not included each and every fact known to me concerning this investigation.   I have set forth only the facts that I believe are necessary to establish probable cause to believe that the defendant committed the offense alleged in the complaint.

3.      This affidavit is based on my personal knowledge, information provided to me by other law enforcement agents, physical surveillance, information provided by a confidential source, my review of consensual recordings, and my experience and

1

training, as well as the training and experience of other agents with whom I have spoken.

## I.  BACKGROUND OF THE INVESTIGATION

4.      On or about February 6, 2019, Individual A met with an undercover DEA agent ("UC") in the parking lot of the Gurnee Mills shopping mall where Individual A distributed to the UC approximately one kilogram of heroin. On or about March 14, 2019, Individual A met with the UC again in Waukegan. Individual A gave the UC approximately 900 grams of heroin and approximately two kilograms of cocaine. After Individual A gave the UC the narcotics, the law enforcement officers arrested Individual A.[1]

5.      Individual A was taken to Waukegan Police Department, where he was given his *Miranda* rights. Individual A provided officers a written waiver of his *Miranda* rights and agreed speak with law enforcement. Individual A told law enforcement that the week prior to his arrest, a drug courier delivered 15 kilograms of cocaine to Individual A at his house in Waukegan. Individual A stated that he was selling the 15 kilograms on behalf of Individual B and Individual C, both of whom are narcotics dealers located in Mexico. Individual A provided law enforcement with Individual B's phone and Individual C's phone, both of which were Mexican cell phone numbers. Individual A further stated that he was supposed to meet with a courier in the next few days to deliver the money from the sale of the cocaine. During the

---

[1] Individual A is currently charged federally with a controlled substance offense. Individual A is cooperating with the DEA in the hopes of receiving a reduced sentence for this charge. No promises have been made to Individual A about the outcome of the pending prosecution. Individual A has previous DUI, theft, and firearm related convictions.

interview, Individual A sent a text message to Individual B's phone from the UC's phone number telling Individual B that the UC's phone number was Individual A's new phone number and to contact Individual A at that number going forward.

6.     On or about March 18, 2019, Individual C called the UC and introduced himself as "[Individual A]'s uncle."[2] Individual C asked about Individual A's whereabouts. The UC told Individual C that his name was Carlos and that the UC was Individual A's roommate, Individual A had been arrested on a warrant for traffic related offenses, and that UC had the money Individual A was supposed to deliver to the courier. Individual C told the UC that someone will pick it [money] up tomorrow and that Individual C would greatly appreciate it if the UC turned over the "papers" [money]. On or about March 19, 2019, Individual C called the UC and told the UC that Individual C could arrange for another 30 kilograms to be delivered to the Chicago area. Individual C also told the UC that he had son he referred to as "Junior" that was in possession of narcotics that Junior could sell in order to help Individual A get out jail.

---

[2]  The consensually recorded conversations, including text messages ("recorded conversations"), have been summarized in this Affidavit. The recorded conversations among the UC, Individual C, and CASTILLO, JR. are in Spanish. I am able to read and speak conversational Spanish. The summaries of the recorded conversations throughout this Affidavit are based upon my review of the recorded conversations and review of preliminary translations of the recorded conversations, and do not reflect summaries from certified translated transcripts of the recorded conversations. The times listed for the recorded conversations are approximate. The summaries do not include all statements or topics covered during the course of the recorded conversations. At various points in the Affidavit, I have included my interpretation of words and phrases used in the recorded conversations. My interpretations are based on conversations with and information I received from the UC and Individual A, my knowledge of the investigation as a whole, my experience and training in narcotics investigations, and the experience and training of other law enforcement agents with whom I have consulted.

7.      Over the next several months, the UC and Individual C had periodic phone conversations regarding the potential sale of cocaine. Individual C continued to ask to be paid a broker fee for the narcotics Individual A delivered to the UC on or about March 14, 2019. On or about July 2, 2019, the UC, through another law enforcement officer, wired a broker fee payment of $400 in U.S. currency through Moneygram to Individual C

## II.     FACTS SUPPORTING PROBABLE CAUSE

### A.      CASTILLO, JR. and the UC Meet to Discuss the Sale of Cocaine and Heroin

8.      On or about July 28, 2019, at approximately 1:05 p.m., the UC missed a call from Individual C using Individual C's phone. At approximately 1:23 p.m., the UC called Individual C at Individual C's phone. This call was recorded. Individual C began the call by telling the UC, "Hello my beautiful nephew, I have a good surprise for you. My son is going to call you. I have something for you, there's something. So that you guys can talk, OK?" The UC asked Individual C if his son was here in Chicago and Individual C responded, "Yes, of course in Chicago." Individual C then stated that the UC and his son can work together here [in Chicago] in person and that his son would be calling the UC shortly. The UC asked Individual C if the purpose of the meeting with CASTILLO, SR's son was to discuss "white paint" [cocaine]. Individual C replied, "Yes, yes, yes and very good. He will call you so that we don't talk too much." Individual C further stated that he is currently in Mexico and that he wanted the UC and his son to get together and come to an agreement.

9.     Later that same day, at approximately 3:05 p.m., the UC received a call from a Hispanic male, later identified as GREGORIO CASTILLO, JR.[3], from a phone number ending in 9784 ("CASTILLO, JR.'s phone"). This call was recorded. CASTILLO, JR. asked, "Is this Carlos? I'm calling on behalf of the uncle." The UC replied, "Oh yes, [Individual C] told me you would be calling." CASTILLO, JR. asked if the UC was busy that day. The UC told CASTILLO, JR. that the UC was out of town, but that the UC would be coming back on Sunday night. The UC told CASTILLO, JR. that UC could call him back then. CASTILLO, JR. asked if the UC had his number and the UC replied yes. The UC then asked CASTILLO, JR. where he was located, and CASTILLO, JR. responded that he was located "in Chicago, just north." CASTILLO, JR. and UC agreed to talk the following day.

10.    On or about July 28, 2019, at approximately 9:21 p.m., the UC called CASTILLO, JR. at CASTILLO, JR.'s phone. This call was recorded. CASTILLO, JR. asked where the UC was located and the UC responded that he was near Elgin, Illinois. CASTILLO, JR. stated that he was also located in that area and asked

---

[3] Law enforcement identified GREGORIO CASTILLO, JR. as follows: in recorded calls between the UC and Individual C, Individual C told the UC that he has a son that he referred to as Junior that lived in the Chicago area. A search of law enforcement databases showed that Individual C had previously lived at an address in Hoffman Estates, Illinois. The search also revealed that an individual by the name of GREGORIO CASTILLO, JR. lived at an address on the 1900 block of Holbrook Lane in Hoffman Estates, Illinois ("CASTILLO, JR's address"). After the UC met with CASTILLO, JR. on July 29, 2019 at the Cabela's parking lot in Hoffman Estates, the UC was shown a driver's license photograph of CASTILLO, JR. from law enforcement databases and the UC verified that CASTILLO, JR. was the person he met with in the Cabela's parking lot. Additionally, law enforcement officers and a DEA Airwing helicopter were performing surveillance of the UC's meeting with CASTILLO, JR on July 29, 2019. Following the meeting, surveillance officers and the DEA Airwing helicopter followed CASTILLO, JR. back to CASTILLO, JR.'s address in Hoffman Estates.

whether the UC could meet the next day. The UC and CASTILLO, JR. agreed to meet the next day after 10 a.m., near Elgin, Illinois.

11.     On or about July 29, 2019, at approximately 12:30 p.m., the UC drove to the Cabela's retail store located at 5225 Prairie Stone Parkway, Hoffman Estates, Illinois. At approximately 12:35 p.m., the UC called CASTILLO, JR. at CASTILLO, JR.'s phone. This call was recorded. The UC told CASTILLO, JR. that s/he was at the Cabela's in Hoffman Estates and was ready to meet. CASTILLO, JR. responded that he was eating tacos near the intersection of Barrington Road and Bode Road and that he would meet the UC in 15 minutes at the Cabela's. The UC gave CASTILLO, JR. a description of his/her vehicle and CASTILLO, JR. stated that he was driving a white Nissan sedan.

12.     Later that day, at approximately 1:01 p.m., CASTILLO, JR. called the UC from CASTILLO, JR.'s phone. This call was recorded. CASTILLO, JR. stated that he just entered the parking lot of the Cabela's and the UC gave CASTILLO, JR. the location of where s/he was parked. A few minutes later, the UC saw a white 2018 Nissan Altima ("CASTILLO, JR.'s vehicle")[4] park next to the UC's vehicle. CASTILLO, JR. exited CASTILLO, JR.'s vehicle and entered the UC's vehicle through the front passenger side door. The UC had video and audio recording equipment set up inside the vehicle and the meeting between the UC and CASTILLO, JR. was video and audio

---

[4] The white 2018 Nissan Altima ("CASTILLO, JR.'s vehicle") is owned by PV Holding Corporation, which is the parent company of Avis Budget Rental Car. Pursuant to an administrative subpoena served on Avis Budget, law enforcement has learned that CASTILLO, JR.s' vehicle was rented by GREGORIO CASTILLO, JR. on July 10, 2019 through August 1, 2019. On August 1, 2019, the rental agreement for CASTILLO, JR.'s vehicle was renewed by CASTILLO, JR. through August 21, 2019.

recorded. CASTILLO, JR. introduced himself as "the son of [Individual C], I'm Junior." CASTILLO, JR. asked if the UC was friends with Individual C. The UC responded that s/he was friends with [Individual A] and that the UC helped Individual A get the work out [sell the narcotics]. The UC told CASTILLO, JR. that Individual A and Individual C had a falling out because Individual A lost some narcotics and still owed Individual C for it. CASTILLO, JR. stated, "My boss [Individual C] told me about that and he was bothered by it. I don't know what happened there, but he said that you are good for working [selling narcotics]." The UC explained to CASTILLO, JR. that Individual A gave a guy a kilogram of "Chinese food" [heroin] on consignment and the guy took off without paying [for the heroin]. CASTILLO, JR. stated, "That's why they [source of supply] closed the door on them [Individual C and CASTILLO, JR.]. The company [source of supply] was bothered by that. But it doesn't matter because I am with a new company [source of supply] and everything looks good here." CASTILLO, JR. then asked the UC, "what do you work with [what drugs does the UC sell]?" The UC responded that s/he has buyers of "Chinese food" [heroin] and "white paint" [cocaine], but that UC had an easier time selling "white paint" [cocaine]. CASTILLO, JR. stated, "This company [source of supply] brings pure white cars [kilograms of cocaine]. We refer to them [kilograms of cocaine] as cars. They have pure cars for racing." The UC told CASTILLO, JR. that the quality has to be good, because it [cocaine] will be used for cooking [crack cocaine]. UC told CASTILLO, JR. that if the quality is not good, people will be returning it to the UC. CASTILLO, JR. responded, "The only thing they will be returning is dollar bills to you." CASTILLO, JR. then stated, "This company [source of supply] specializes in pure cars [cocaine] and racing

type cars." CASTILLO, JR. asked the UC what price the UC was looking for. The UC responded that s/he was selling cocaine for $33 to $34,000 per kilogram. CASTILLO, JR. stated, "They [kilograms of cocaine] went up, but I'm going to get you a number [price] that you can make money." CASTILLO, JR. also told the UC that the UC would have to pay upon delivery of the cocaine. CASTILLO, JR. told the UC to call him when the UC had "the tickets [money] ready." CASTILLO, JR. further related that he lived in Schaumburg, Illinois and that he had a place where the UC could go and check out the "aparato", a Spanish word meaning apparatus that is also a common slang term for a kilogram of cocaine. CASTILLO, JR. told the UC that they [kilograms of cocaine] should be ready this week. CASTILLO, JR. then asked if the UC could work [sell] with "food" [heroin]. The UC said that s/he had several customers for it and asked CASTILLO, JR. for the price. CASTILLO, JR. responded, "Since I usually don't work it [heroin], I have worked it [heroin], but I used to give it to [Individual A]. He would take care of that [selling the heroin]." CASTILLO, JR. stated that Individual A stopped answering his calls and his father's calls and did not know the reason. The UC told CASTILLO, JR. that it was because of the one kilogram of heroin Individual C gave to Individual A and that Individual A lost it. CASTILLO, JR. then told the UC, "I gave that [kilogram of heroin] to him, I gave that to him, and I gave him cars [kilograms of cocaine] and everything and I don't know what they [Individual A] did with it." CASTILLO, JR. then told the UC that he would get prices for the UC and that CASTILLO, JR and the UC could talk at a later date. The UC told CASTILLO, JR. that the UC will start getting the "papers" [money] together and that the UC could

take three to four [kilograms] right away. The UC and CASTILLO, JR. agreed to talk the following day.

13.     CASTILLO, JR. then exited the UC's vehicle and entered CASTILLO, JR.'s vehicle and left the Cabela's parking lot. The UC recognized the voice of the individual the UC met in his/her vehicle as the same person the UC spoke to using CASTILLO, JR.'s phone.

14.     Following the meeting between the UC and CASTILLO, JR., law enforcement officers performing surveillance of the meeting, as well as a DEA Airwing helicopter, followed CASTILLO, JR. in CASTILLO, JR.'s vehicle after he left Cabela's parking lot. CASTILLO, JR. first drove to a Subway restaurant. After leaving the Subway, CASTILLO, JR. drove to a residence located on the 1900 block of Holbrook Lane in Hoffman Estates, Illinois ("CASTILLO, JR.'s residence") and parked CASTILLO, JR.'s vehicle in the driveway of CASTILLO, JR.'s residence. Based on a search of law enforcement databases, this address is listed as CASTILLO, JR.'s residence on his Illinois driver's license. The UC was shown a driver's license photograph of CASTILLO, JR. from law enforcement databases and the UC verified that CASTILLO, JR. was the person he met with in the Cabela's parking lot.

**B.     CASTILLO, JR. Provides a Sample of Heroin to the UC**

15.     On July 30, 2019, at approximately 8:57 a.m., CASTILLO, JR. called the UC from CASTILLO, JR.'s phone. CASTILLO, Jr. asked if the UC was busy today. The UC advised him that the UC was busy picking up "papers" [money] owed to the UC. CASTILLO, JR. told the UC that he wanted to meet about the "food" [heroin] that they had previously discussed. The UC asked CASTILLO, JR. if they [CASTILLO,

JR.'s supplier] had given him a price [per kilogram]. CASTILLO, JR. responded, "I'm working on that, but I wanted to give you a photo [sample of heroin] first." The UC asked CASTILLO, JR. if they could meet tomorrow. The UC and CASTILLO, JR. agreed to meet the following day around noon.

16.     On or about July 31, 2019, at approximately 11:30 a.m., the UC drove to the Cabela's parking lot in Hoffman Estates, Illinois. At approximately 11:39 a.m., the UC called CASTILLO, JR. at CASTILLO, JR.'s phone, but received no response. At approximately, 11:42 a.m., CASTILLO, JR. called the UC from CASTILLO, JR.'s phone. This call was recorded. The UC told CASTILLO, JR. that the UC could meet with him at the same location as before [Cabela's parking lot] and CASTILLO, JR. agreed to meet at that location.

17.     Prior to the UC's meeting with CASTILLO, JR., at approximately 11:50 a.m., law enforcement officers set up surveillance ("Surveillance") at CASTILLO, JR.'s residence and at the Cabela's in Hoffman Estates. At approximately 12:16 p.m., Surveillance observed CASTILLO, Jr. leave CASTILLO, JR.'s residence and enter CASTILLO, JR.'s vehicle, which was parked in the driveway outside, and drive away. At approximately 12:26 p.m., Surveillance observed CASTILLO, JR.'s vehicle drive into the Cabela's parking lot and drive towards the UC's vehicle. At approximately 12:28 p.m., Surveillance and the UC saw CASTILLO, JR. exit CASTILLO, JR.'s vehicle and enter the UC's vehicle. The UC and CASTILLO, JR. first exchanged greetings. CASTILLO, JR. told the UC, "Look, I brought you this, I brought you a photo [sample of heroin]." CASTILLO, JR. then handed the UC a clear plastic baggie wrapped in a paper towel. The UC saw that the plastic baggie contained a substance

that looked like suspect heroin. CASTILLO, JR. stated, "Let me know and with that we can work [proceed with the sale of heroin]." The UC told CASTILLO, JR. that s/he has people that can test it out. The UC also asked CASTILLO, JR. to get the UC a good price so that they could both make money. CASTILLO, JR. asked the UC how many [kilograms of heroin] the UC needed. The UC responded that "if the quality was good I could take four [kilograms of heroin]." CASTILLO, JR. stated that the price was "50" [$50,000 per kilogram]. The UC advised him that the price is high, but if the quality is good, maybe the UC can make something [profit] on it. CASTILLO, JR. responded, "He was told that on a scale of 1 to 10, this [heroin] is a 9." The UC advised CASTILLO, JR. that s/he "usually gets it [heroin] at 41 [$41,000 per kilogram] and that if they [CASTILLO, JR.'s suppliers] could lower the price a little bit, then the UC can get "4" [kilograms of heroin]. CASTILLO, JR. asked the UC, "will you be paying upon receipt [of the heroin] and the UC responded, "Yes." CASTILLO, JR. also told the UC that the "cars [cocaine] will be arriving this weekend but, the food [heroin] is ready, that's why they [CASTILLO, JR's suppliers] gave me the photo [sample of heroin]." The UC and CASTILLO, JR. agreed to talk the following day.

18.    Later that day, at approximately 3:51 p.m., the UC received a text message from CASTILLO, JR. using CASTILLO, JR.'s phone stating, "Let me know what they say about the photo [sample of heroin]." At approximately 7:01 p.m., the UC replied by text message, "The photo [sample of heroin] was very pretty, but they didn't like the price." At approximately 7:37 p.m., CASTILLO, JR. texted back from CASTILLO, JR.'s phone, "43 y Pulaski" [code for $43,000 per kilogram].

19. On or about August 1, 2019, at approximately 1:38 p.m., CASTILLO, JR. called the UC from CASTILLO, JR.'s phone. This call was recorded. The UC told CASTILLO, JR. that the UC's clients liked "the photo" [sample of heroin], but the price was too high. CASTILLO, JR. responded that the price was "43" [$43,000 per kilogram] and that is what CASTILLO, JR. meant in his text message the day before. The UC responded that s/he could "definitely work with that number [price]." The UC then said that s/he needed a few days to get everything together. The UC and CASTILLO, JR. agreed to talk at a later date.

## C. CASTILLO, JR. and the UC Discuss the Sale of Cocaine

20. On or about August 6, 2019, at approximately 3:50 pm, the UC received a text message from CASTILLO, JR. using CASTILLO, JR.'s phone that stated, "Primo the car [cocaine] is ready". The UC replied by text message to CASTILLO, JR., "Primo I'm glad you called me, my phone was damaged and I lost all my numbers." CASTILLO, JR. then responded by text message from CASTILLO, JR.'s phone, "Primo are you ready." The UC wrote back, "I return tomorrow night and I will call you to start working."

21. On or about August 8, 2019, at approximately 3:17 pm, CASTILLO, JR. called the UC from CASTILLO, JR.'s phone. This call was recorded. The UC told CASTILLO, JR. that the UC had all the "papers" [money]. The UC asked CASTILLO, JR. if he had the "white paint" [cocaine]. CASTILLO, JR. responded, "The cars [cocaine] are ready. They are here." The UC asked CASTILLO, JR. if s/he could start with "2 and 2" [two kilograms of cocaine and two kilograms of heroin] to show the customers. CASTILLO, JR. responded, "The cars [cocaine] are at 32 [$32,000 per

kilogram]." CASTILLO, JR. stated that he would check with "his guy" [supplier] about the heroin and call the UC back.

22. Later that day, at approximately 5:13 p.m., CASTILLO, JR. called the UC from CASTILLO, JR.'s phone. This call was recorded. CASTILLO, JR. told the UC, "The cars [cocaine] will be ready early tomorrow and for the food [heroin], I will let you know when I see you." The UC asked if s/he could purchase the heroin and the cocaine at the same time. CASTILLO, JR. responded, "No, they are different lines [from different suppliers]." The UC told CASTILLO, JR. that s/he wanted to start with the "food" [heroin] first. The UC and CASTILLO, JR. agreed to talk later.

23. On or about August 9, 2019, at approximately 11:41 a.m., the UC sent a text message to CASTILLO, JR. at CASTILLO, JR.'s phone stating, "Primo I'm ready, I have for 4 [kilograms] if you can." At approximately 1:19 p.m., CASTILLO, JR. called the UC from CASTILLO, JR.'s phone. This call was recorded. The UC told CASTILLO, JR. that s/he had "the papers [money] for the four [kilograms of cocaine]." CASTILLO, JR. responded that he was ready and that he had "two [kilograms] already set aside" for the UC, but he will check on the other two kilograms. The UC and CASTILLO, JR. agreed to talk later. At approximately 1:39 p.m., CASTILLO, JR. sent a text message to the UC from CASTILLO, JR.'s phone stating, "Awaiting confirmation on the cars [cocaine] Primo."

24. Later that day, at approximately 3:18 p.m., CASTILLO, JR. called the UC from CASTILLO, JR.'s phone. This call was recorded. CASTILLO, JR. told the UC, "The cars [cocaine] aren't race cars, they are not as powerful [the quality of the cocaine is not good] and they [supplier] only have one [kilogram]." The UC initially told

CASTILLO, JR. that s/he would take the one kilogram of cocaine, but later told CASTILLO, JR. that s/he would rather wait for the heroin. CASTILLO, JR. told the UC that he would be ready the following day with the heroin. Later that evening, at approximately 8:51 p.m., the UC called CASTILLO, JR. at CASTILLO, JR.'s phone. This call was recorded. The UC told CASTILLO, JR. that s/he forgot about a prior commitment the next day and that s/he would not be able to meet with CASTILLO, JR. The UC and CASTILLO, JR. agreed to meet on Monday [August 12, 2019].

### D.    CASTILLO, JR. Agrees to Sell a Kilogram of Heroin to the UC

25.    On or about August 12, 2019, at approximately 8:40 a.m., Surveillance was established at CASTILLO, JR.'s residence in Hoffman Estates, Illinois. At approximately 10:02 a.m., the UC called CASTILLO, JR. at CASTILLO, JR.'s phone, but received no response. At approximately 10:07 a.m., CASTILLO, JR. called the UC from CASTILLO, JR.'s phone. This call was recorded. The UC told CASTILLO, JR. that the UC was ready and had "papers [money] for three [kilograms] of the food [heroin]." The UC further told CASTILLO, JR. that s/he could start with just one or two kilograms if that is what CASTILLO, JR. wanted to do. CASTILLO, JR. responded that he would call his supplier and find out and that the UC would probably have to go north to get the heroin. CASTILLO, JR. told the UC that he would let the UC know where to go in an hour.

26.    Later that morning, at approximately 10:30 a.m., Surveillance observed CASTILLO, JR. exit CASTILLO, JR.'s residence and enter CASTILLO, JR.'s vehicle. Surveillance followed CASTILLO, JR.'s vehicle from the area of CASTILLO JR.'s residence heading east on Higgins Road and eventually get onto the I-90 expressway

heading eastbound toward Chicago. At approximately 10:57 a.m., the UC received a text message from CASTILLO, JR. using CASTILLO, JR.'s phone that stated, "at 12 primo." The UC responded by text message, "Where."

27.     That same day, at approximately 11:16 a.m., Surveillance saw CASTILLO, JR.'s vehicle arrive and park in front of a residence on the 4600 block of North Kelso Avenue in Chicago, Illinois. Surveillance then saw CASTILLO, JR. exit CASTILLO, JR.'s vehicle and enter a nearby residence on that block. At approximately 11:55 a.m., Surveillance saw CASTILLO, JR. exit the same residence on the 4600 block of North Kelso Avenue and enter CASTILLO, JR.'s vehicle. Shortly thereafter, a male individual, later identified as Individual D[5], exited the same residence and entered the front passenger seat of CASTILLO, JR's vehicle. Surveillance then saw CASTILLO, JR. and Individual D leave the area in CASTILLO, JR.'s vehicle heading westbound on Montrose Avenue.

28.     Later that day, at approximately 12:40 p.m., the UC called CASTILLO, JR. at CASTILLO, JR.'s phone. This call was recorded. CASTILLO, JR. apologized for not responding to the UC and said that "his guy [supplier] was extremely busy, but he will be ready in 45 minutes." CASTILLO, JR. further told the UC that he would send the UC directions on where to meet.

---

[5] As described further below, law enforcement officers conducted a traffic stop of CASTILLO, JR.'s vehicle on August 12, 2019 at approximately 2:10 p.m. CASTILLO, JR. was accompanied by a Hispanic male in the front passenger seat, who provided officers with name and date of birth. Law enforcement was able to verify Individual D's identity through a search of law enforcement databases. Surveillance officers were shown Individual D's photograph from law enforcement databases and confirmed that Individual D was the person who entered CASTILLO, JR.'s vehicle at approximately 11:55 a.m. earlier that day.

29. Later that afternoon, at approximately 1:24 p.m., CASTILLO, JR. called the UC from CASTILLO, JR.'s phone. This call was recorded. CASTILLO, JR. told the UC that he was ready to meet. The UC asked how many kilograms CASTILLO, JR. was able to get. CASTILLO, JR. replied, "one [kilogram of heroin] to start, Primo." CASTILLO, JR. then told the UC to go to the intersection of 5th Avenue and North Avenue in Melrose Park. The UC asked if they could meet at a location halfway, and CASTILLO, JR. responded that he would check if his supplier would agree to it. At approximately 1:27 p.m., CASTILLO, JR. called the UC from CASTILLO, JR.'s phone. This call was recorded. CASTILLO, JR. told the UC that his supplier had other commitments and instructed the UC to meet them at the Target store located near the intersection of 5th Avenue and North Avenue in Melrose Park.

30. That same day, at approximately 1:53 p.m., Surveillance saw CASTILLO, JR.'s vehicle pull into a Shell gas station located on West North Avenue in River Forest, Illinois. CASTILLO, JR. exited his vehicle and walked around the parking lot of the gas station. At approximately 2:00 p.m., a black Dodge minivan entered the Shell gas station. An unidentified individual exited the Dodge minivan and that individual and CASTILLO, JR. began talking with each other. Several minutes later, at approximately 2:03 p.m., Surveillance saw CASTILLO, JR. and the unidentified individual reenter their respective vehicles and leave the Shell gas station heading eastbound on North Avenue, with CASTILLO, JR.'s vehicle following behind the Dodge minivan. Surveillance then saw CASTILLO, JR's vehicle and the Dodge minivan drive approximately half a mile on North Avenue before turning left on Newland Avenue, and then entering an alley running parallel to North Avenue. A

couple of minutes later, at approximately 2:05 p.m., Surveillance saw CASTILLO, JR.'s vehicle exit the alley and eventually turn westbound on North Avenue. Surveillance lost sight of the Dodge minivan.

31.     Shortly after CASTILLO JR.'s vehicle began driving westbound on North Avenue, at approximately 2:07 p.m., CASTILLO, JR. called the UC from CASTILLO, JR.'s phone. This call was recorded. CASTILLO, JR. asked the UC how long it would take for the UC to arrive at the Target. The UC responded that s/he would be there in 15 minutes. At approximately 2:10 p.m., a Des Plaines canine officer ("canine officer") conducted a traffic stop on CASTILLO, JR.'s vehicle for following the vehicle immediately ahead of CASTILLO, JR.'s vehicle too closely. The traffic stop was conducted on the 7500 block of West North Avenue in Elmwood Park, Illinois. The driver of CASTILLO, JR.'s vehicle provided the canine officer with an Illinois driver's license identifying him as CASTILLO, JR. The passenger in CASTILLO, JR.'s vehicle later provided law enforcement officer with his/her name and date of birth, which law enforcement used to verify Individual's D's identity through law enforcement databases. When the canine officer approached CASTILLO, JR.'s vehicle and spoke with CASTILLO, JR., the canine officer smelled a strong odor of burnt cannabis emanating from CASTILLO, JR.'s vehicle. The canine officer also observed small bits of green plant material, suspected to be cannabis, within CASTILLO, JR.'s vehicle. Based on these observations, the canine officer brought his canine partner, Jager, to conduct a free air sniff around CASTILLO, JR.'s vehicle and Jager positively alerted

to the presence of narcotics inside of CASTILLO, JR.'s vehicle.[6] The canine officer, accompanied by other law enforcement officers, proceeded to search CASTILLO, JR.'s vehicle. During the search, law enforcement officers found a black Adidas book bag in the trunk of the vehicle. The book bag contained a white plastic bag, inside of which was a heat sealed bag containing a brick-like object wrapped in tape. The contents of the brick-like object field tested presumptively positive for the presence of heroin and weighed approximately one kilogram. Law enforcement officers then placed CASTILLO, JR. and Individual D under arrest.

**E.     CASTILLO, JR.'s Post-Arrest Interview with Law Enforcement**

32.     Following his arrest, at approximately 2:20 p.m., law enforcement officers read CASTILLO, JR. his *Miranda* rights from a pre-printed form while CASTILLO, JR. was in a squad car. CASTILLO, JR. acknowledged his *Miranda* rights and agreed to speak with law enforcement. CASTILLO, JR. told law enforcement the following: CASTILLO, JR. became indebted to a drug trafficking organization ("DTO") in Mexico approximately two years ago after he had narcotics and money stolen from him. Over the last two years, CASTILLO, JR. has tried to pay the debt off by selling marijuana and cocaine, but he has not been able to pay the debt off. Approximately one month ago, a member of the DTO contacted CASTILLO, JR., reminded him of the

---

[6] According to the canine officer, Jager is certified annually by the Illinois Law Enforcement Training and Standards Board as a narcotics dog. Jager was most recently re-certified on June 26, 2019. Jager is trained to sniff vehicles, rooms, and lockers to detect the odors of heroin, cocaine, marijuana, methamphetamine, and other controlled substances that could be contained inside. Jager is also trained to indicate the presence of such substances or their scents by alerting to the item he is sniffing. According to Des Plaines Police Department records, Jager success rate in alerting to controlled substances is approximately 90%

debt he owed, and told CASTILLO, JR. that if he acted as a middle man for the sale of heroin to an individual in the Chicago area, his debt would be forgiven. CASTILLO, JR. agreed and he was later given a phone number for an individual he only knew as "Carlos" [the UC]. CASTILLO, JR. told law enforcement that he met with Carlos twice at the Cabela's parking lot in Hoffman Estates and discussed the sale of heroin and cocaine. CASTILLO, JR. further admitted that he offered Carlos a kilogram of heroin for $50,000, and later dropped the price to $40,000 when Carlos pushed back on the initial price. CASTILLO, JR. further admitted that a member of the DTO provided him with a kilogram of heroin and that he was going to meet Carlos at the Target in Elmwood Park, Illinois to deliver the heroin before being pulled over. CASTILLO, JR. refused to provide any information on the DTO. CASTILLO, JR. was then taken to Blue Island Police Department for processing.

33.     After CASTILLO, JR. arrived at Blue Island Police Department, at approximately 4:28 p.m., law enforcement again read CASTILLO, JR. his *Miranda* rights from a pre-printed form. CASTILLO, JR. signed a written waiver of his *Miranda* rights. Law enforcement proceeded to interview CASTILLO, JR., but the interview was terminated shortly thereafter when CASTILLO, JR. asked to speak with an attorney. At approximately 4:48 p.m., CASTILLO, JR. requested to speak with law enforcement without an attorney present. Law enforcement proceeded to conduct a recorded interview with CASTILLO, JR. CASTILLO, JR. provided law enforcement with the same information that he provided law enforcement in the squad car, as described in paragraph 32 above.

## III.    CONCLUSION

34.    Based on the foregoing facts, I respectfully submit that there is probable cause to believe that, on or about August 12, 2019, GREGORIO CASTILLO, JR. did knowingly and intentionally possess with intent to distribute a controlled substance, namely, 100 grams or more of a mixture and substance containing a detectable amount of heroin, a Schedule I Controlled Substance, in violation of Title 21, United States Code, Section 841(a)(1).

FURTHER AFFIANT SAYETH NOT.

Antonio Vazquez
Task Force Officer, Drug Enforcement
Administration

SUBSCRIBED AND SWORN to before me on August 13, 2019.

SUSAN E. COX
United States Magistrate Judge